William J. HARNETT, Plaintiff,

v.

RYAN HOMES, INC., a corporation, and Edward M. Ryan, Defendants.

RYAN HOMES, INC., a Pennsylvania corporation, Plaintiff,

v.

WASHINGTON HOMES, INC., a Maryland corporation, Defendant.

Civ. A. Nos. 68–1383, 69–537.

United States District Court,
W. D. Pennsylvania.

June 8, 1973.

Kirkpatrick, Lockhart, Johnson & Hutchison, by John K. Tabor, David McClenanhan, Michael C. McLean, Pittsburgh, Pa., for William J. Harnett and Washington Homes.

Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, by Harold Gondelman, Donald S. Hershman, Pittsburgh, Pa., for Edward M. Ryan and Ryan Homes, Inc.

Eckert, Seamans, Cherin & Mellott, by Edward G. O'Connor, David L. Parmer, Pittsburgh, Pa., for Ryan Homes, Inc.

## OPINION and ORDER

McCUNE, District Judge.

We have before us various motions for new trial and judgment n. o. v. in this complicated litigation which evolved from the complex personal, corporate and financial relationships of William J. Harnett and Edward M. Ryan.

Essentially, this suit involves alleged violations of § 10(b) of the Securities and Exchange Act of 1934 and alleged breaches of contract. Two suits, Civil Action No. 68–1383 and Civil Action No. 69–537 with various claims, alternate claims and counterclaims, were tried non jury before this court in May and June of 1972. Before discussing and deciding the motions now before us we will set forth again as background for this opinion, our findings of relevant fact distilled from three weeks of trial.[1]

The pertinent facts of what has been referred to as the "10(b)–5" case (C.A. 68–1383) brought by plaintiff Harnett and the counterclaim of Edward Ryan are as follows:

The suit was brought in the fall of 1968 to recover 1000 shares of stock in Ryan Homes, Incorporated (hereafter Ryan Homes) shortly after Ryan Homes completed a successful sale of stock to the public (i. e., "going public") after some years of operation as a closely held

1. We gave our findings of fact and conclusions of law orally from the bench following the conclusion of each phase of the case. We now substantially affirm those findings of fact in all phases of the case. Our conclusions of law have been somewhat modified.

corporation engaged in the home building business.[2]

In short, the plaintiff alleged that he was induced by certain misrepresentations to sell his stock in Ryan Homes back to the corporation (Ryan Homes) in May, 1965, under circumstances which made imperative the application of the antifraud provisions of the Securities and Exchange Act of 1934.[3]

Plaintiff Harnett began to work for Ryan Homes in 1961 after working as a home salesman for several years with another company. Harnett was a good salesman and by 1965 had become an excellent sales executive with extensive knowledge of home building, sales and land development. He moved rapidly up the Ryan Homes corporate ladder[4] and by 1965, when he left Ryan Homes under circumstances which we shall explore in detail, he was Vice-President of Marketing and a member of the Operating Committee. Harnett and Ryan Homes President, Edward Ryan, developed a close business and personal relationship and Harnett became Ryan's able and trusted assistant.

Employees of Ryan Homes were permitted to purchase stock in the company. On the advice and with the financial assistance of Edward Ryan, Harnett purchased 1000 shares over several years time. All stock held by employees was subject to a so-called buy-sell or trust agreement. The agreement which plaintiff Harnett had executed required that when a stockholder left the employ of the company that he sell his shares back to the company at a price equal to their book value at the end of the prior quarter.[5]

In 1963 or early 1964, Edward Ryan, a talented executive and experienced home builder, became aware of the existence and availability of an 8000 acre

---

2. The 1000 shares which plaintiff Harnett had purchased while in the employ of Ryan Homes would have been split 75 shares for one in the process of going public if Harnett had not sold them back to the corporation. Subsequently, the stock was further split three shares for one. The original 1000 shares now amount to 225,000 shares worth, at the time of trial, in the neighborhood of $6 million if the stock had all been retained and had not been sold in parcels meanwhile.

3. Manipulative and Deceptive Devices
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. § 78j, Securities and Exchange Act § 10.
Employment of Manipulative and Deceptive Devices
It shall be unlawful for any person, directly or indirectly, by use of any means

or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
(a) to employ any device, scheme, or artifice to defraud,
(b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. 240, 10b–5, Securities and Exchange Act Rule 10b–5.

4. Harnett's rapid rise did not occur without friction between him and other Ryan Homes executives, especially James Ryan (Edward Ryan's brother) who became President of Ryan Homes in 1966. It was apparently James Ryan who blocked Harnett's appointment to the Ryan Homes Board of Directors.

5. For reasons we do not find necessary to develop, the defendants argue that this agreement alone precludes the application of § 10(b). While this argument has some merit and is supported by some precedent, we have not decided the case on that point.

tract near St. Charles City, Maryland.[6] He considered the land suitable for housing construction if sufficient funds and personnel could be found to develop it. Edward Ryan intended to undertake this vast project with Ryan Homes, but he found opposition within his Board of Directors.

Mr. Ryan was not easily dissuaded. Thwarted by his Board of Directors in his plan to have Ryan Homes directly involved in the development of the St. Charles tract, Ryan sought to involve the company indirectly. It was at this time (late 1964) that Sampson-Miller Associated Companies, Inc., (hereafter SMAC) entered the picture. No doubt, however, there had been prior discussion with SMAC, and there is no doubt that Edward Ryan sought the assistance of SMAC [7] so that he could use it and its subsidiaries to develop the land. Ryan Homes then would have an outlet in Maryland for its homes.

On December 26, 1964, SMAC (which by this time Edward Ryan controlled through stock and financial arrangements)[8] through its wholly owned subsidiary, Hallmark Homes, Inc., entered into an agreement with St. Charles City, Inc. to purchase 1400 lots in the St. Charles development on which it would build homes. The agreement, among other things, gave Hallmark exclusive building rights at St. Charles and set up a multi-step schedule under which St. Charles City, Inc. would "develop" the lots on the tract of land. The lots, of course, were of no great value until developed (i. e., roads, streets, curbs, etc., in place), approved by the municipalities involved and ready for sale to a builder who could build and sell homes.

SMAC was not able financially without out Edward Ryan's help and backing to engage in the contemplated construction of homes. In fact, it was involved in Chapter XI bankruptcy proceedings. St. Charles City, Inc. was also in some financial difficulty. Nevertheless, Edward Ryan, who saw a great opportunity in the St. Charles project, was able to arrange and negotiate a $4.75 million loan to St. Charles City, Inc. from Western Pennsylvania National Bank for use in so-called acquisition and development. Edward Ryan personally guaranteed $200,000 of the loan and persuaded Celotex Company to guarantee $500,000 and the Berens Company, (through their parent company, Associated Mortgages Company, Inc.) to guarantee another $500,000.

Edward Ryan's interest in SMAC was probably prompted as well by the possible advantage of merging Ryan Homes with SMAC. The merger would enable him to make a twofold use of SMAC— (1) it could provide a relatively simple way to take Ryan Homes public [9] since

6. It is not precisely certain how Edward Ryan found out about the St. Charles City Tract, but plaintiff Harnett contends that he found it and brought it to Ryan's attention. It is likely, however, that so large a tract of land was well known in the home building industry. Previous attempts by other builders to develop the project had failed.

7. The acronym SMAC was often used interchangeably during the trial with that of its affiliated or subsidiary companies, Hallmark Homes and Sampson Brothers of Maryland. That practice, although technically incorrect, is for convenience continued in this opinion.

8. Edward Ryan was a member of the Board of Directors and owned $100,000 worth of debentures convertible into 100,-000 shares of voting stock. Ryan Homes owned 44% of the stock and held $300,-000 worth of their debentures convertible into 300,000 shares of voting stock.

9. Edward Ryan and other Ryan Homes executives (including Harnett) had been giving a great deal of thought in the early 1960's to the possibility of Ryan Homes "going public."

In 1964 and 1965, Harnett was deeply involved in negotiations between Ryan Homes and the underwriting firm of White, Weld and Co. regarding the terms of Ryan Homes going public. As late as the spring of 1965, the public offering appeared "iminent." As we shall discuss later, during the negotiations Arthur Palmer of White, Weld "advised" Edward Ryan that White, Weld would not

SMAC was already a listed corporation with its stock traded over-the-counter, and (2) SMAC's $2.5 million tax loss could be used as an offset against Ryan Homes' steadily increasing profits.

The financing for the development of the land having been arranged, the project hit a snag: Sampson Brothers of Maryland which had started to build a few homes in early 1965 was having trouble pleasing customers. One veteran, in particular, complained to the Veterans Administration (VA) that the defective foundation in his new house did not meet VA standards. Consequently, SMAC began to get into hot water with both the VA and The Federal Housing Administration (FHA)—a critical development since no project the size of St. Charles could succeed without homes that met the standards required to obtain VA and FHA financing. In March 1965 the VA was threatening to disqualify SMAC as a builder of VA financed homes.

By April, 1965, it appears to us that Edward Ryan was in considerable trouble. He was deeply involved in a project that was starting to turn sour. He had personally guaranteed a $200,000 loan to St. Charles and had used his friendship and connections with the Celotex Corporation to involve them in what appeared might be a highly precarious loan guarantee. The Ryan Homes Board of Directors was not interested in a merger with SMAC and had affirmed their previous coolness toward the St. Charles project in general. Edward Ryan turned to his brother, James, who we have previously indicated was also a Ryan Homes executive, and attempted to persuade him to take over and manage the St. Charles development. James Ryan, however, remained adamant in his opposition to the project and refused his brother's offer.

Edward Ryan then turned to Harnett. Edward Ryan had brought Harnett into the Ryan Homes organization, trained and promoted him, and considered him an extremely able executive (an assessment later events demonstrated to be amply correct). In the course of their business and personal relationship Harnett became privy to Edward Ryan's business thinking and planning, especially about taking Ryan Homes public. He had also become familiar—perhaps intimately familiar—with the St. Charles project. He was acquainted with the operations and personnel of St. Charles City, Inc., SMAC, Hallmark Homes and Sampson Brothers of Maryland. He knew about their involvement in the St. Charles project and the role and motives of Edward Ryan in backing SMAC. In fact, he made trips to Maryland and attended meetings concerning the St. Charles project on behalf of Edward Ryan.

In early 1965 Edward Ryan began to attempt to persuade Harnett to go to SMAC and take over the St. Charles project. Harnett testified he was reluctant to leave Ryan Homes for the new position, essentially because he did not want to sell his 1000 shares of Ryan Homes stock (as the buy-sell agreement would require) when it seemed that Ryan Homes was about to go public and he would be able to sell his shares at a great profit. On April 24, 1965, Edward Ryan told the Ryan Homes Board of Directors that no employee except himself would be able to sell his shares to the public for five years after the first public offering. Subsequently, on May 13, 1965, Harnett and Edward Ryan reached an agreement under which Harnett went to SMAC.

The basic agreement was embodied in a handwritten note (Exhibit H–W49B) signed by both Harnett and Edward Ryan. Although it contained many terms, in essence the agreement was that Harnett would resign from Ryan Homes and go to work for SMAC; that

underwrite the stock offering unless Ryan Homes would "disassociate" from SMAC. Harnett tetified that neither he nor anyone else knew of this. For reasons which do not appear in the record, the underwriting arrangements with White, Weld fell through and Ryan Homes did not go public in 1965.

he was to receive a salary of $4000 per month;[10] and that he was to sell his 1000 shares of Ryan Homes stock back to the corporation for $150.00 per share.[11] A "run-up" clause provided that Harnett would also be paid the difference, if any, between the price he received for the stock when he sold it and what it was worth on December 31, 1965.

As agreed Harnett did resign from Ryan Homes and go to work for SMAC. In fact, he became a director of SMAC and we believe he was a substantial guiding force in SMAC after his arrival. He was not paid by SMAC, however. He was paid through the Penn-Clair Construction Company, a corporation wholly owned by Edward Ryan.

It was out of this basic story that the present litigation evolved. For purposes of perspective and context, we will fill in the picture of the years 1965 to 1968 with sketchy details now, and provide more substance when we consider and evaluate the particulars of the 10(b)–5 action and the other breach of contract questions.

In June, 1965, Edward Ryan issued a directive that the name "Ryan Homes"[12] not be used in descriptions of the homes built at St. Charles.

In July, 1965, Edward Ryan told Harnett that the underwriters for the public stock offering, White, Weld, had advised him in late 1964 or early 1965 that in order for Ryan Homes to go public, Ryan Homes had to disassociate from SMAC. According to Harnett's testimony this was the first he had heard about any possible disassociation.

In September, 1965, Edward Ryan told Harnett that on December 28, 1964, Ryan Homes had received an option to take from Hallmark Homes (SMAC's wholly owned subsidiary) at any time, its exclusive rights under the basic December 26, 1964 contract to construct

homes at St. Charles. Again, according to Harnett's testimony, this was the first time he had known of the right of reassignment.

In October, 1965, the threatened VA and FHA disqualification of SMAC occurred. In order to get around the disqualification and still fulfill SMAC's obligations under the December 26, 1964 agreement with St. Charles City, Inc., a new corporation, Washington Homes, was formed. Harnett paid the $10,000 organizational fees and became President, Chairman of the Board, and only stockholder of Washington. Hallmark assigned the December 26, 1964 agreement to Washington and Washington then owned all of the exclusive rights which Hallmark had owned and had optioned to Ryan Homes.

By December, 1965, White, Weld and Co., for reasons not in the record, had decided not to take Ryan Homes public. In 1966, Ryan Homes suffered severe financial reverses but in 1967 had begun a comeback. In 1968 Ryan Homes finally went public in an offering in which some Ryan Homes employees in addition to Edward Ryan were permitted to participate. The underwriting firm was Faulkner, Dawkins and Sullivan Securities, Inc.

Washington Homes became a successful and profitable corporation and in 1969 it, too, went public.

Both Edward Ryan and Harnett have become very wealthy men. It is apparent that Harnett has gained at least as much wealth from the ownership or sale of Washington stock as he would have gained from the ownership or sale of the Ryan Homes stock he now seeks to recover.

I

We now turn to the specifics of the 10(b)–5 claim. Plaintiff Harnett complains of four things in his assertion

---

10. His salary at Ryan Homes at the time he resigned was $1700 per month.

11. By subsequent agreement the price per share was changed to $142.00.

12. "Ryan Homes" is a brand or trade name which is widely advertised and apparently has some market acceptance.

that his stock was fraudulently obtained from him.

(1) Edward Ryan made a misrepresentation of material fact or misleading statement by omission when he told the Ryan Homes Board of Directors in April, 1965, that no Ryan Homes employee except himself could go public for five years after the first public stock offering.

(2) Edward Ryan made misrepresentations of material facts or misleading statements by omission when, during negotiations with Harnett in the spring of 1965, he said that "Ryan Homes" would always be built in St. Charles.

(3) Edward Ryan made misrepresentations of material facts or misleading statements by omission when, during negotiations with Harnett in the spring of 1965, he said that Ryan Homes and SMAC would merge.

(4) Edward Ryan made a misleading statement by omission when, during the course of negotiations with Harnett in the spring of 1965, he did not tell Harnett that Ryan Homes had an assignment option on the December 26, 1964 agreement between St. Charles City, Inc. and Hallmark Homes.

As we see it, allegations numbers 1, 2, and 3, in effect, assert alternate violations: either the statements themselves were false, or there was a misleading omission. The misleading omissions in allegations 1, 2 and 3 were:

(1) that under the first allegation at the time or shortly after Edward Ryan made the statement to the Board of Directors he had devised a plan under which some employees of Ryan Homes would go public; and

(2) that under the second and third allegations Edward Ryan did not tell Harnett that White, Weld Co. had advised him in late 1964 or early 1965 that they would not take Ryan Homes public unless it disassociated from SMAC. (Consequently, "Ryan Homes" would not be built at St. Charles and there would be no merger between Ryan Homes and SMAC).

In summary our rulings are as follows: [13]

(1) Harnett was an insider insofar as the alleged misrepresentations in No. 2 and No. 3 and the alleged omission in No. 4 are concerned because we think he must have known the truth about these things;

(2) We do not think the omissions alleged in No. 2 and No. 3 were material;

(3) We do not think the statement made the subject of allegation No. 1 was a misstatement or that the omission was of a material fact.

We shall explain each of these conclusions in sequence.

A. It is axiomatic that one insider cannot maintain a suit against another.[14] An "insider" is, as a basic

---

13. Stated differently our rulings, in summary, are:

No. 1. This was not a misstatement when made and was not a misleading statement by omission of material fact.

No. 2. Harnett was an insider and, therefore, cannot maintain a suit for this alleged misrepresentation. It was not a misleading statement by omission of a material fact.

No. 3. Harnett was an insider and, therefore, cannot maintain a suit for this alleged misrepresentation. It was not a misleading statement by omission of a material fact.

No. 4. Harnett was an insider and, therefore, cannot maintain a suit for this alleged misleading statement by omission.

14. ". . . There is no duty to disclose information to one who reasonably should already be aware of it. Nor is there the necessity for one insider to 'search out details' for another insider, in the sense that such a duty might exist toward others less informed." Myzel v. Fields, 386 F.2d 718, 736 (8th Cir. 1967) cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), quoting Kohler v. Kohler, 319 F.2d 634 (7th Cir. 1963).

"A fortiori, if the party has the information in question, he cannot complain of its non-disclosure to him. . . . Any rational view of 10(b)–5 requires that (this qualification) must be read in, as was done without analysis in Texas Continental Life Ins. Co. v. Dunne, 307

definition, one that has information that another party does not have. Obviously if both parties to the sale are equally well informed then both are "insiders" and neither can be said to have defrauded the other. The question of who is an "insider," therefore, cannot be decided on the basis of the title one holds in the corporate organization. A director, or officer, or even the president of a corporation cannot always and invariably be classified as an insider. The analysis turns, instead, on the basis of what a party knows or reasonably should know considering the information to which he has access.[15] Tobacco and Allied Stocks, Inc. v. Transamerica Corp., 143 F.Supp. 323 (D.Del.1956).

As a vice-president of Ryan Homes and trusted assistant of Edward Ryan, we think Harnett knew enough about the dangers and opportunities at St. Charles to make him an insider, even though he was not a director of Ryan Homes.

As we have pointed out earlier, Harnett was no stranger to Ryan Homes. He was intimately familiar with its operation in general and its involvement with the St. Charles project in particular. We think he was experienced enough to have known that the St. Charles project (and Edward Ryan's direct and indirect involvement in it) was beset with problems. The situation was far from stable and it was apparent that significant changes had to be made in the management and operations of the project if it was to succeed. It was to effect these changes, after all, that Edward Ryan wanted Harnett to go to St. Charles. Harnett knew that the Ryan Homes Board of Directors was opposed to the St. Charles project; that James Ryan opposed it; and that the threatened VA and FHA disqualification of SMAC, if carried out, would make it difficult for Ryan Homes to continue its involvement since Ryan Homes obviously would not want to risk similar disqualification as a result of its association with SMAC.

Edward Ryan had worked out a five-year projection for the development of St. Charles and had shown it to Harnett. The projections were Edward Ryan's aspirations for St. Charles and, as we think Harnett knew, they were only aspirations or estimates at best.

Harnett was experienced enough to appreciate the precarious nature of the housing business. He knew it was impossible to lay concrete plans in developing raw land of this size in the tenuous business circumstances of the mid-1960's. He knew of all the uncertainties involved: that the Ryan Homes corporate entity might not exist from year to year; or that the Board of Directors might change or obstruct the plans which Edward Ryan envisioned; or that Edward Ryan might become insolvent or fail in health or die.

Consequently, we do not think plaintiff's second assertion of misrepresentation or omission is credible. We think he knew, or should have known, that "Ryan Homes" would not necessarily always be built at St. Charles.

For similar reasons we do not think the third assertion of misrepresentation or omission is credible. For the reasons we have stated above we think Harnett

F.2d 242 (6th Cir. 1962), settlement agreement enforced 343 F.2d 618 (6th Cir. 1965), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965)." 1 A. Bromberg, Securities Law: Fraud, § 4.4 pp. 75–6 and n. 33 (1971).

15. The "insider" concept extends for purposes of Rule 10(b)–5 to any employees "who are in possession of material undisclosed information obtained in the course of their employment." SEC v. Texas Gulf Sulphur, D.C., 258 F.Supp. 262, 279. This "insider" test was later followed in Ross v. Licht, 263 F.Supp. 395, 409 (S.D. N.Y.1967).

The Eighth Circuit has approved an instruction that "An insider is a person who because of his position or intimate association with a corporation has greater knowledge of the financial affairs of the corporation." Myzel v. Fields, 386 F.2d, at 739.

knew that the Edward Ryan—Ryan Homes—SMAC—St. Charles relationship was shifting and unstable. Therefore, we think he knew that a merger between Ryan Homes and SMAC was not a certainty and might not take place. One of plaintiff's own exhibits supports this conclusion. Edward Ryan had worked out a handwritten projection of what could happen to the value of Ryan Homes and SMAC stock with and *without* a merger between the two. Therefore, even if we found that the plaintiff had no knowledge of the Board of Directors' reticence about St. Charles, and even if we found that he was completely innocent of all the negotiations going on, he could not very well rest upon Edward Ryan's silence on the proposed merger since the projection shown to him clearly put him on notice that a merger might not happen.

Again, we think Harnett knew, or should have known, that a Ryan Homes—SMAC merger was not a certainty.

We find that Harnett in May, 1965, knew enough about the Ryan Homes operations to make him an insider concerning what are now alleged to be misstatements of material facts in allegations two and three, and cannot, therefore, maintain a suit under § 10(b).

B. As to plaintiff's fourth allegation of misrepresentation—that he was not told Ryan Homes had an assignment option on the December 26, 1964 agreement—we think that it also lacks credibility. It seems to us that a lot of people in the Ryan organization did know this before May, 1965, because at a special meeting of the Board of Directors on December 31, 1964, it was announced that in consideration of loans made to St. Charles City, Inc., Sampson Bros. of Maryland had agreed to assign to Ryan Homes all of its right, title, and interest under its agreement with St. Charles City, Inc., and of all of the collateral and documents attached thereto. While it is true Harnett was not a Director, he was a Vice-President and very much involved in St. Charles affairs. Perhaps he could have missed such knowledge, but we think it is more probable that he knew.

C. If plaintiff contends that the crucial omission in assertions Nos. 2 and 3 was Edward Ryan's failure to tell Harnett of White, Weld's requirement that Ryan Homes disassociate from SMAC before going public (as opposed to his failure to tell him that "Ryan Homes" would not be built and that Ryan Homes and SMAC would not merge), we still find no merit in the contention. Considering what we have previously found Harnett to have known about the Ryan Homes corporation and Ryan Homes' involvement in the St. Charles project, we do not think that the alleged omission was material.[16] As we have pointed out, Harnett knew of the risks and uncertainties involved at St. Charles. But he also knew there was great opportunity there. By going to SMAC he was to receive over twice his old salary, to become president of a public corporation, to have an opportunity to make a name for himself and the possibility to make a great deal of money. We doubt that it would have affected his decision if he had known what White,

---

16. The standard of "materiality" can vary depending on the transaction involved. "Some sort of reasonable man, objective test of investment judgment, intrinsic value, or (in the case of a publicly traded security) significant market effect is appropriate. Such tests have been formulated in a variety of different phases. (Citing cases). A looser test may be more suitable for affirmative misrepresentations. A looser or more subjective one may also be proper in direct personal transactions because of the greater ability of one party to appreciate the position of the other. The later proposition has found some judicial acceptance." (Emphasis added). A. Bromberg, op. cit., § 8.3, p. 199. See Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1962), aff'g 208 F.Supp. 808 (E.D.Wis.1962). Because of the close personal and business relationship of Harnett and Edward Ryan and Harnett's familiarity with Ryan Homes we think this is an appropriate case for the application of a looser, more subjective standard.

Weld had told Edward Ryan about terminating the Ryan Home association with SMAC.

Our analysis might be different if we thought that Edward Ryan was willing or had firmly decided to disassociate Ryan Homes from SMAC and pass up the St. Charles opportunity as the price for going public, or if we thought that White, Weld's condition of disassociation was absolute and unalterable. The record, however, supports neither conclusion. Negotiations between White, Weld and Ryan Homes continued for almost a year after the underwriters first expressed concern (in late 1964 or early 1965) about the Ryan Homes—SMAC relationship. There was no indication in early 1965 that Edward Ryan intended to disassociate from SMAC. He still talked with Harnett about a possible merger between Ryan Homes and SMAC, attended meetings on the St. Charles project, and maintained his position as a member of the SMAC Board of Directors.

■ D. Turning to the alleged misrepresentation in the first allegation we do not think that it, either, can support a 10(b)–5 action since we do not find, as a matter of fact, that it was a misrepresentation.

Plaintiff alleges, in effect, that Edward Ryan lied when he said at a Ryan Homes Board of Directors meeting in April, 1965, that no employees would be able to go public for five years after the first public offering because he in fact had a plan in mind then by which some employees would be able to sell shares to the public.

We do not find that this was a misrepresentation because we do not think Edward Ryan lied when he made the policy statement to his Board of Directors. Our position might be different if Edward Ryan had privately assured Harnett that he, Harnett, would not be

able to go public in what appeared to be an attempt to persuade him to sell his Ryan Homes stock and go to SMAC. But that was not the case. We simply find that this statement was not actually a false statement but a statement of what Ryan then thought would be the plan for going public.[17] If the statement was false we do not think he would have given it as wide circulation as it was given. It was a projection or opinion based upon what he then knew.

The statement was a general statement of policy made to the Board of Directors but it was not within anyone's power to observe if the underwriters changed the plan. Harnett knew that for Ryan Homes to go public it must meet the requirements of an underwriter, and no one knew what those requirements would be. In fact, White, Weld (which in April, 1965, was devising the underwriting plan) never did take Ryan Homes public. Ryan Homes discussed its plans to go public with other underwriters at other times and a satisfactory plan was not developed until 1968. The intervening years illustrate what any executive of Ryan Homes including Harnett must have known: that Ryan Homes was in a business that was subject to the whims of the public, the economy of the nation, the availability of money, the rate of unemployment, and perhaps a dozen other factors. Under the circumstances no Ryan Homes executive could have believed that any policy was certain, definite and unalterable.

We understand plaintiff's position to be that this alleged misrepresentation was the basis of this portion of the 10(b)–5 claim. However, plaintiff may be going further. It was not the misrepresentation, he might argue, but the omission to reveal a subsequent plan[18] to allow employees to go public which was the violation since Edward Ryan failed to reveal a fact which would have made

17. We note in passing that one year later in the spring of 1966, according to the Ryan Homes Board of Directors minutes, Edward Ryan's position still was that no

employees would be able to go public for five years.

18. Exhibit HW–52.

the first statement not misleading. We would still not find a 10(b)–5 violation.

■ The statute and rule only require that an insider reveal "material facts." We think the subsequent plan was nothing more than his random thoughts reduced to paper and need not have been revealed. Along a continuum between solid, important information and rank speculation, surely the former must be revealed but the latter need not be. It would be impossible to precisely peg Edward Ryan's "plan" at some point along the continuum. Suffice it to say we think it was closer to the latter, i. e., speculation.

Edward Ryan's freedom of decision and action in this area was severely circumscribed by the dictates of the stock underwriter. The plan was not a plan which Edward Ryan could unilaterally put into effect.

Early 1965 was a period of especially intense planning and negotiation among various parties about the St. Charles project, Ryan Homes relationship to SMAC, and the possibility of Ryan Homes going public. Absent some evidence that it was something more, we think that the "plan" was only the kind of speculation or aspiration that continually occupies the minds of businessmen.

And in any event, Harnett was not included in the list of employees who would be able to sell to the public. Consequently, we do not think he would have given the plan much weight in making his decision to sell his Ryan Homes stock since if he had kept it he could not have sold it under the terms of the plan.

## II

We next consider plaintiff Harnett's alternate claim for relief. Harnett al- leges a breach of contract because Edward Ryan did not pay the full agreed-upon price for Harnett's 1000 shares of Ryan Homes stock.

In a handwritten agreement [19] executed May 13, 1965, Harnett and Edward Ryan attempted to detail the mutual obligations surrounding Harnett's agreement to go to SMAC. Harnett agreed (inter alia) to resign from Ryan Homes and go to SMAC, Edward Ryan promised to make Harnett president and a member of the Board of Directors of SMAC within the year, Edward Ryan agreed to sell to Harnett $50,000 worth of SMAC convertible notes held by Ryan Homes, Harnett was to receive a $4,000 per month salary, and Harnett agreed to make a short term loan to Edward Ryan of $90,000. In addition, there was a provision detailing the terms of the sale of Harnett's stock to the corporation.

The relevant clauses regarding the price to be paid for the stock are as follows:

"6. May 15, 1965, I will sell my Ryan Homes, Inc. stock to Ryan Homes, Inc. for $150,000.00.

7. On Jan. 2, 1966, you will also pay to me the dollar difference in value of 1,000 shares of Ryan Homes Stock on December 31, 1965, and the amount of $150,000.00 which I am to receive on May 15, 1965. (Example: I receive $150,000 for 1,000 shares on May 15, 1965 and value of stock on December 31, 1965 is $170,000. You would pay me $20,000.00)."

By subsequent agreement between Harnett and Edward Ryan the price per share was modified to $142.00. On June 7, 1965, Harnett was paid $142,000 for his stock. On June 8, 1965, portions of the May 13 agreement were again stated by letter.[20]

---

19. Exhibit HW–49B.

20. The letter agreement, signed by both Edward Ryan and Harnett reads:
"Dear Bill:
 You have this date purchased $50,000.00 face amount of the demand note in the face amount of $300,000.00 dated March

25, 1965, held by Ryan Homes, Inc. as security for its loan to Sampson-Miller Associated Companies, Inc., the maker of the note in the amount of $300,000.00.
 This letter is to evidence our agreement that on January 2, 1966, at the request of either of us, you will sell and I will purchase the said note in the face amount

The book value of Ryan Homes, Inc. stock on December 31, 1965 was $160.79 per share. The additional amount alleged to have been due on January 2, 1966 was never paid.

At the close of this portion of the trial we entered a pro forma oral verdict from the bench in favor of the plaintiff in the amount of $18,790 (the difference between $142 and $160.79 x 1000 shares) plus interest from January 2, 1966.

We now affirm that decision.

Edward Ryan asserts in his motion for judgment n. o. v. that the decision should be set aside or that there should be a set-off allowed against the amount found owing.

■ According to defendant Ryan's first argument, Harnett was obligated under the terms of the buy-sell agreement to sell his stock back to Ryan Homes when he resigned at $124 per share, the book value at the close of the preceding quarter. The agreement to sell the shares for $18 above book value, he argues, cannot stand because there is a failure of consideration.

We disagree. There is evidence that the buy-sell agreement was not always enforced, and when it was enforced its terms were not always strictly applied. We think the terms of the sale in question were the product of long and detailed negotiations and not a mere *pro forma* application of the terms of buy-sell agreement. We find the contract on its face to be supported by ample consideration and therefore enforceable according to its terms.

Defendant Ryan further contends that assuming there is consideration he is entitled to a $16,000 set off. The set off, he argues, represents Harnett's unjust enrichment from salaries received by Harnett following his resignation from Ryan Homes from Ryan's personally

owned corporations for which Harnett did no work.

■ Again, we disagree. There is adequate evidence in the record that Harnett, if he did not work directly for Edward Ryan and Ryan Homes, worked to protect the interests and investment of Edward Ryan and Ryan Homes at St. Charles. Further, we think that although not stated specifically it was envisioned throughout the negotiations leading to the May agreement that this would be Harnett's role. In effect, then, defendant Ryan is asking us to pass on the adequacy (or overadequacy) of consideration. As a rule, courts will not do this.

Accordingly, we find for the plaintiff Harnett in the amount of $18,790 with interest accruing from January 2, 1966.

### III

We turn now to the claim of Ryan Homes, Inc. against Washington Homes, Inc. at Civil Action No. 69–537.

In essence, the plaintiff avers that Washington Homes ("Washington") breached its contract to pay Ryan Homes $200 per lot for the first 208 lots developed at St. Charles. The total claim is $41,600.

The operative facts are as follows: As already noted Harnett left Ryan Homes in the early summer of 1965 and went to work for SMAC as he and Edward Ryan agreed he would do. Shortly after Harnett began working at SMAC trouble arose with Ryan over the relationship between Ryan Homes and SMAC when Edward Ryan told Harnett that "Ryan Homes" could not be built at St. Charles and that Ryan Homes had a reassignment option to take over the basic contract of December 26, 1964, from Hallmark Homes. This friction was increased by SMAC's continuing troubles with the Veterans and Federal Housing Administrations. These separate con-

of $50,000.00 dated June 8, 1965, at a price in the amount of $50,000.00 *plus the dollar difference of book value of one thousand shares of Ryan Homes, $142,000.00.*

This agreement will be binding upon our heirs, legal representatives and assigns." (Emphasis added).

flicts came to a head in late 1965 and their resolution gave rise to this phase of the litigation.

During November, 1965, intense negotiations were conducted in an attempt to resolve the St. Charles problem. The course of these negotiations can best be detailed by a chronological listing.

*October, 1965.* The VA declared SMAC and all of its subsidiaries (including Hallmark Homes) to be "uninsurable risks" and disqualified them from its program. Subsequently, FHA followed suit. It was apparent that with Hallmark blackballed by VA and FHA, SMAC would not be able to meet its obligations under the December 26, 1964 Basic Agreement with St. Charles, Inc.

*October 29, 1965.* The SMAC Board of Directors met to discuss a plan to form a new corporation (St. Charles Homes, Inc., later Washington Homes) to take over and complete Hallmark's obligations under the December 26, 1964 agreement. According to the minutes of the meeting [21] an agreement had been proposed between St. Charles Homes, Inc. and Hallmark "under which St. Charles Homes, Inc. would agree to exercise all Hallmark's rights and perform all its duties (in respect to the first 208 lots in the city to be known as St. Charles) under the agreement dated December 26, 1964, between Hallmark and St. Charles City Inc. In consideration, therefore, St. Charles (Homes, Inc.) would pay to Hallmark $300 per lot at the closing thereof and pay Ryan Homes $200 per lot at the same time (such payment to Ryan Homes, Inc. thereby discharging Hallmark's obligations to Ryan in respect to such lot.)"

Among others present at the meeting were Joseph Hardy (a SMAC director who subsequently paid $10,000 to organize what became known as Washington Homes) and Harnett. The SMAC Board of Directors, on motion duly made and seconded, authorized the SMAC directors to consummate the proposed arrangement between St. Charles Homes (Washington) and Hallmark Homes.

*November 2, 1965.* Edward Ryan and Harnett met and executed a document captioned "Agreement." [22] The agreement involved certain arrangements between Edward Ryan, Harnett, SMAC, Washington Homes and Ryan Homes. Paragraph 6 stated that SMAC would pay to Ryan Homes $200 for each of the first 208 lots sold in St. Charles by St. Charles Homes (Washington). (Washington had not yet been formally incorporated by Hardy or taken over by Harnett). The agreement, however, was subject to a condition. Edward Ryan wrote in light blue pencil along paragraphs 1, 2, and 3 that they were subject to approval by the Ryan Board of Directors.

*November 2–5, 1965.* Sometime during this period the Ryan Homes Board of Directors, according to Edward Ryan, approved the November 2, 1965 agreement. There are no minutes of a Board of Directors meeting during this period in evidence.

*November 5, 1965.* Edward Ryan and Harnett met again. There is some confusion over what occurred at that meeting and we are not certain that the Board of Directors' approval of the November 2 agreement was communicated to Harnett in a definite, final and firm manner. In any event, during the meeting, Edward Ryan proposed another plan to "give William J. Harnett Washington Homes."

*November 8, 1965.* Washington Homes was incorporated by Joseph Hardy.

*November 10–12, 1965.* St. Charles City, Inc. and Hallmark renegotiated the Basic Agreement of December 26, 1964. The new contract included a provision

---

21. Exhibit PX–11.

22. It is dated November 2, 1966, but it is apparent that the date should have been November 2, 1965. It is Exhibit HW 68A.

that the contract would be assigned to Washington Homes.

*November 11, 1965.* Hallmark assigned its rights under the contract with St. Charles City, Inc. to Washington Homes.

Edward Ryan and Harnett drafted and signed an agreement[23] under which Harnett had an option of choosing within five days to acquire certain stock and notes of SMAC and become an officer of SMAC; or to become the sole shareholder of Washington and have equal rights to lots under the Basic Agreement for $10,000 "total consideration."

*November 15, 1965.* Harnett chose the second option of the November 11 agreement.

*November 17, and December 1, 1965.* Edward Ryan personally guaranteed $1 million of construction loans to Washington Homes.

*March 21, 1966.* Harnett requested further financing. Both Edward Ryan and Ryan Homes refused to guarantee any further loans.

■■■ The plaintiff's theory is that when Washington Homes was formed it became responsible to pay $200 per lot for the first 208 lots at St. Charles. It appears to us that the best evidence of that obligation presented at trial consisted of two exhibits (PX–11 and HW68A).[24]

The first of the two exhibits, PX–11, is a copy of the minutes of the October 29, 1965 meeting of the SMAC Board of Directors.

It is the plaintiff's theory that Harnett was present at the meeting as a promoter of Washington Homes and bound Washington Homes to the projected obligation.

Hardy attended the meeting as a representative of St. Charles Homes (Washington) and Harnett attended the meet-

ing, but we do not think it could be said that on October 29 Harnett attended as a promoter. We simply do not think that Harnett's mere attendance at a meeting where there was a discussion about a corporation not yet formed which he eventually would come to own, can be held to amount to a ratification of a subsequent agreement which thereby bound Washington Homes.

Setting aside the problem of silence as evidence of ratification, we do not think there can be a valid ratification based on Harnett's attendance at the meeting because if there were any contracts made at the meeting they were altered and amended by subsequent negotiations. On October 29, 1965, there was a great deal of confusion and uncertainty over how the St. Charles project would be run. Final arrangements were not settled, in fact, until over two more weeks of intense negotiations were completed. Although the SMAC Board of Directors voted to approve the proposed St. Charles Homes—Hallmark agreement, it was still only a *proposed* agreement and we do not think there was a clear, comprehensive statement of what the final terms would be.

For these reasons we do not think that the evidence was definite enough to justify placing legal responsibility on Washington Homes for the payments.

The second important piece of evidence is exhibit PX–27, also labeled HW68A, the November 2 agreement between Edward Ryan and Harnett. Ryan contends that the agreement bound Harnett to make the payments.

There is, however, a difficulty with the agreement. As we discussed before, at least insofar as three of its important paragraphs were concerned, it was subject to a condition. Paragraphs 1, 3, and 4 had to be submitted to the Ryan Homes Board of Directors for approval.[25]

---

23. Exhibit HW 70B

24. Of course a great quantity of other evidence of dealings between the parties was introduced as a basis for establishing the extent of obligations. We do not find it

persuasive, however, and will not discuss it.

25. The three paragraphs in question read:
"1. WJH agrees to purchase and EMR agrees to sell 88,000 of the SMAC shares

We take it that Edward Ryan did not feel he had the authority to agree to the conditions of the written instrument at the time he signed it. We might assume as true for the sake of argument that Harnett, on November 2, was deeply involved and perhaps even a promoter of Washington Homes.[26] But that does not bind Washington Homes to this agreement because at the time he was speaking for SMAC, not Washington Homes.

Our additional difficulty with this exhibit is that we are not convinced that the conditions to the agreement were met. Assuming that the Ryan Homes Board of Directors approved the agreement, we are uncertain whether the approval was ever communicated in a definite, final and firm (much less written) manner.

Plaintiff's counsel argued that the thrust of Edward Ryan's testimony was that he did orally communicate the Board's approval to Harnett, but we did not get that impression from his testimony, at least with any degree of certainty. We are not saying that we disbelieve Edward Ryan, only that we did not understand him to say that he had clearly communicated the approval to Harnett.

 While it is obviously true that the law imposes upon a corporation the obligations of the promoters which the corporation has ratified or adopted, the evidence here is that neither Harnett nor Washington Homes ever ratified the November 2 agreement. In fact, instead of affirmatively ratifying the action of the SMAC Board on October 29, 1965, or the agreement of November 2, 1965, Harnett did just the opposite. He refused to ratify and repudiated these actions.

Ryan Homes cannot avoid this ratification requirement by arguing that Harnett cannot legally make contacts as a promoter and then avoid liability by failing to ratify them when he becomes, in effect, the corporation because we do not find as a fact that Harnett was a promoter of Washington Homes when the November 2 agreement was made.

 At trial Ryan Homes sought permission to amend its pleadings to include the additional theory of quasi-contract or quantum meruit. We denied it. The motion was renewed in post-trial motions and now we deny it again. The pleading and discovery in this case has been comprehensive and voluminous. All sides have had fair opportunity to assert their claims. We think that under the circumstances the requested amendment is belated and unnecessary.[27]

Accordingly, we affirm our previous holding for the defendant Washington Homes.

## IV

The final phase of this litigation involves a counterclaim for breach of con-

---

held by Ryan Homes, Inc. to me on or before Jan. 15, 1966. WJH to pay $44,000 in installments of $15,000 on Jan. 1, 1967, $15,000 on Jan. 1, 1968 and $14,000 on Jan. 1, 1969. WJH's liability shall be limited to the stock. . . .

3. *EMR agrees to obtain absolute voting power* for all SMAC stock held by Ryan Homes, Inc. and copy of the legal document granting this right will be presented to WJH prior to Jan. 15, 1966. This document will state that in the event of the demise, incapacity, or retirement of EMR his voting rights will be transferred to an impartial party such as Mellon National Bank and Trust Co. of Pgh.

4. EMR agrees to cause the demand notes to the SMAC Company owned by Ryan Homes to be revised so that S.M.

A.C. will have the option to pay to holders of the notes $2.00 for each $1.00 of face value of the notes in lieu of converting the notes into *S.M.A.C. Common Stock*, providing that said notes have been held for a minimum of 5 years from this date." (Emphasis in the original.)

26. However, there is no evidence that his *taking over* Washington Homes had even been discussed as of that time.

27. Even if we permitted amendment plaintiff would not prevail. We do not believe the evidence is definite enough with respect to what transpired immediately after the formation of Washington Homes that we could base a finding of liability on their alternate theory.

tract filed by Washington Homes against Ryan Homes and Edward Ryan personally.

The counterclaim (in paragraph 62) asserts that Edward Ryan and Ryan Homes failed to perform certain contractual obligations. in the following respects:

(a) Failure to assign "top key personnel," including Edward Ryan, to the St. Charles City project on a top priority basis;

(b) Failure to design houses for the St. Charles City project;

(c) Failure to give financial support, including necessary guarantees for construction loans for Washington Homes, Inc.;

(d) Refusal to consent and approve the construction of "Ryan Homes" in the St. Charles City project.

Washington Homes asserts that Ryan Homes made these commitments to SMAC and Hallmark in the "Basic Agreement" of December 26, 1964. It further asserts, stated simply, that these rights flowed to Washington Homes through the assignment of the contract to Washington Homes on November 11, 1965.

Washington Homes asserts that because of these breaches of contract it was unable to meet its obligations under the contract with St. Charles City, Inc. assigned to it by Hallmark. As a result the contract with St. Charles City, Inc. had to be renegotiated and more burdensome terms were imposed on Washington Homes.

The factual basis of the counterclaim flows out of facts discussed in our disposition of plaintiff Ryan Homes' claim. As we mentioned previously, Harnett and Edward Ryan met on November 2, 1965, and executed a document which proposed certain relations between Ryan Homes, SMAC, Washington Homes and Harnett. Certain portions of the agreement were subject to the approval of the Ryan Homes Board of Directors. There

is insufficient evidence, however, that the Board or Edward Ryan communicated approval of the agreement to Harnett.

In early November, Edward Ryan found himself in a morally difficult position with his protege Harnett. He had persuaded Harnett to leave Ryan Homes and take a position with SMAC on representations that there was a great opportunity at St. Charles. But it appeared the opportunity might not develop. The entire project had bogged down: the developer, St. Charles City, Inc., was far behind schedule; no houses had been built or sold; VA and FHA had disqualified SMAC and Hallmark; and Edward Ryan, under pressure from his Board of Directors, was trying to reduce his corporate involvement in the St. Charles project.

On November 11, 1965, Edward Ryan .asked Harnett to meet him in downtown Pittsburgh and go with him to Mass. According to Harnett's testimony Edward Ryan said he was going to "search his soul" to try to find a favorable solution to the dilemma for Harnett. After the Mass, Edward Ryan and Harnett went to the offices of the Ryan Homes' attorneys. There they drafted and signed an agreement [28] under which Harnett had an option of choosing within five days either to acquire certain stock and notes of SMAC and become an officer of SMAC, or to become the sole shareholder of Washington and have equal rights to lots under the "Basic Agreement" for $10,000 "total consideration."

On November 15, Harnett chose the latter option. On November 17 and December 1, Edward Ryan personally guaranteed almost $1 million of construction loans to Washington Homes. On March 21, 1966, after Harnett requested further financing, both Edward Ryan and Ryan Homes refused.

In our oral opinion on the counterclaim entered at trial we found for Ryan

---

28. Exhibit HW–70B

Homes and Edward Ryan. We think that decision was correct.

By November, 1965, all the differences and disputes between the parties which had developed between May and November, 1965, had come to a head. We think that in a resolution of these difficulties Harnett accepted the Washington Homes stock and the obligation of Ryan Homes to Washington Homes ceased.

 Harnett's testimony concerning his understanding at the time leads us to conclude that he accepted the stock and the opportunity that went with it with the full realization that Ryan Homes would not thereafter continue to participate in the St. Charles project and that there would be a parting of the ways. He testified that on December 2, 1965, he told Edward Ryan he would not pay the $200 per lot because he considered his obligation to Ryan Homes at an end when he paid the $10,000 organizational expenses for Washington Homes.

Why did Harnett think there would be no further Ryan Homes participation at St. Charles and that consequently he had no obligation to pay the $200? As we pointed out in our previous findings, the Ryan Homes Board of Directors had evidenced from the beginning their disenchantment with the St. Charles project. By the summer and early fall it was apparent that Ryan Homes was clearly on a course of disassociation. Edward Ryan had resigned from the SMAC Board of Directors. He had informed Harnett that "Ryan Homes" could not be built at St. Charles. Harnett knew all this. In fact, he testified he was "shocked" when he learned of some of these things.

We have little doubt, as Harnett testified, that Edward Ryan, personally, made certain promises regarding aid or assistance he would give to Harnett to get the new corporation afloat. Clearly, Harnett could not have undertaken the vast job at St. Charles with Washington Homes which at the time was a mere shell of a corporation. But it was by no means proved at trial what exactly these promises of "men, money and materials" involved. If, in November, 1965, Edward Ryan made concrete promises they were never reduced to writing and we do not know what they were.

In any event, it is apparent that Edward Ryan did give substantial direct and indirect assistance to Harnett and Washington Homes. He personally guaranteed a loan to construct the first 75 houses. He offered no significant objection or resistance when Harnett hired away several Ryan Homes executives. And, most importantly, Ryan Homes never attempted to compete with Harnett at St. Charles.

 Harnett also raises, as an alternate contractual theory, the doctrine of promissory estoppel. We hold that there is no evidence upon which such a theory could be based because of our findings that Harnett knew when he accepted the option that Ryan Homes would not be involved in the project. As a result there were no promises on which he could have relied to his detriment.

We hold that Ryan Homes and Edward Ryan were in no way legally obligated to provide any aid or assistance to Harnett after November 15, 1965. Therefore, on the counterclaim for breach of contract, we find for the counter defendants, Ryan Homes and Edward Ryan.