**Joseph D. FELDMAN, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**SIMKINS INDUSTRIES, INC. and Bear, Stearns & Co., Defendants.**

**No. C–78–0380–WWS.**

United States District Court,
N. D. California,

June 19, 1980.

David L. Braverman, David B. Gold, A Professional Law Corp., San Francisco, Cal., for plaintiff.

Michael R. Jencks, John St. John, Armour, St. John, Wilcox & Goodin, San Francisco, Cal., Paul R. Rosen, Spector, Cohen, Hunt & Rosen, P. C., Philadelphia, Pa., for defendants.

## MEMORANDUM OF OPINION AND ORDER

WILLIAM W SCHWARZER, District Judge.

Plaintiff Joseph D. Feldman brought this action against Simkins Industries, Inc.

("Simkins") and a brokerage house, Bear, Stearns & Co. ("Bear, Stearns") for violations of § 17(a) of the Securities Act of 1933 ("Securities Act") (15 U.S.C. § 77q(a)),[1] § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. 78j) and its implementing Rule 10b–5 (17 C.F.R. § 240.10b–5). Jurisdiction is founded on § 22 of the Securities Act (15 U.S.C. § 77v(a)) and § 27 of the Exchange Act (15 U.S.C. § 78aa). Following a motion for summary judgment, the Court on March 14, 1979, disposed of plaintiff's claims under §§ 5, 12 of the Securities Act (15 U.S.C. §§ 77e, 77*l*(1), § 13(d)(2) of the Exchange Act (15 U.S.C. § 78m(d)(2)) and state law. On October 19, 1979, the Court certified the proceeding as a class action brought on behalf of a plaintiff class composed of "[a]ll persons who purchased Fibreboard Corporation common stock from January 26, 1978 through January 31, 1978, inclusive." The action went to trial before a jury on April 7, 1980; upon completion of plaintiff's case, the Court advised the parties that it would grant defendants' motion for a directed verdict.

The relevant facts are largely undisputed. The Court is mindful of its obligation on a motion for directed verdict to view the evidence and resulting inferences in the light most favorable to plaintiff, but where "without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict," *Brady v. Southern Railway Co.*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); *Cullinan v. Burlington Northern, Inc.*, 522 F.2d 1034, 1036 (9th Cir. 1975), a directed verdict is proper.

### FACTS

The alleged securities act violations arise out of the sale by Simkins of a block of

1. It is unnecessary to decide whether plaintiff has a right of action under § 17(a) of the Securities Act, *Aaron v. SEC*, — U.S. —, —, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980) (the question remains open), inasmuch as § 17(a) is coterminous with § 10(b) of the Exchange Act for purposes of this litigation.

Although § 17(a) may differ with respect to questions of venue, jurisdiction, available remedies or persons liable, none of these issues affects the outcome of this decision. *In re Equity Funding Corp. of American Securities Litigation*, 416 F.Supp. 161, 185 n.16 (C.D.Cal. 1976).

Fibreboard Corporation ("Fibreboard") common stock during the period January 27 to January 31, 1978. At all times material to this litigation, Fibreboard was a publicly held corporation whose 3,300,000 shares of common stock traded on the New York Stock Exchange ("NYSE"). For some time prior to January 26, 1978, three entities owned or controlled 31% of the common stock of Fibreboard: Simkins owned or controlled through related entities 477,200 shares, approximately 14% of the outstanding shares; Denison Mines, Ltd. ("Denison") owned approximately 300,000 shares, 9% of the outstanding shares; and Bohemia, Inc. ("Bohemia") owned approximately 260,000 shares, 8% of the outstanding shares.

Leon Simkins, the president and chief operating officer of Simkins Industries, made the investment decisions for Simkins and the related enterprises. During 1977, he became increasingly disenchanted with the seven million dollar investment in Fibreboard and considered disposing of the stock, which had been purchased at an average cost of $15.25 a share. Simkins's dissatisfaction stemmed from the stock's low market price, the suspension of dividends, poor corporate earnings and ongoing disagreements between him and management. During late 1977 and early 1978, rumors circulated in the financial community that Fibreboard was a potential merger candidate. On January 19, 1978, Fibreboard issued a news release advising the public of continuing discussions with companies contemplating the possible acquisition of Fibreboard. On January 24, 1978, Harry Merlo, president of Louisiana-Pacific Corporation ("L–P"), wrote to Dale Ogle, president of Fibreboard, offering on behalf of L–P to acquire Fibreboard through a cash merger at $15 per share subject to certain conditions. The letter requested an indication by January 31, 1978, if

> the proposal here outlined is acceptable in principle to the owners of the three largest outstanding blocks of Fibreboard common stock and to the board of directors of Fibreboard.

On January 26, 1978, 72,700 shares of Fibreboard common stock were traded on the NYSE at prices ranging from $14.625 to $13.875 and closing at $14.625 per share. On that day, Fibreboard and L–P issued a news release announcing

> that Louisiana Pacific has made an offer to acquire Fibreboard through a cash merger at $15 per common share, subject to certain conditions, including approval of Fibreboard's three largest shareholders. Such approval has not been obtained. Further discussions between the companies are contemplated. In the event the companies reach any agreement in principle or otherwise, they intend to make a prompt announcement of that fact.

The substance of that announcement went out on the Dow Jones tape at 8:35 a. m. EST, January 26, 1978. An article also appeared in the *Oregon Journal* on that day, describing the merger offer and listing the names of the three largest shareholders whose approval was required. The article quoted Strayer Pittman, president of Bohemia, as saying that " 'we are interested in selling, but at a reasonable price.' He said his firm felt the $15 offer was 'a little low,' and that he expected some negotiations would take place."

Leon Simkins testified that he learned of L–P's $15 offer on January 26, 1978, through either a press release or a call from a broker. He had no prior notice of the offer and had not participated in the negotiations. Ogle called him later in the day to inform Simkins of the offer and its terms and promised to send Simkins a copy of the L–P letter. At some point during the day, Simkins spoke with Pittman of Bohemia and Roman, president of Denison, both of whom indicated that they felt the price was too low. Simkins called Ogle and told him that it was his understanding that the other two shareholders had turned down the offer and he was doing likewise, particularly since the stock was currently trading at almost $15 per share. Throughout the day, Simkins responded to inquiries by brokers and reporters by stating that he considered the offer insufficient.

On January 27, 1978, 298,100 shares of Fibreboard common stock were traded on the NYSE at prices ranging from $16.75 to $14.375, closing at $16.125 per share. Articles appeared in the *Wall Street Journal* and the *San Francisco Chronicle* that day, commenting on the shareholder approval requirements for the merger, the companies' financial situations, and the continuing merger discussions with other companies. A *San Francisco Examiner* article quoted Leon Simkins as characterizing the L–P bid as "not sufficient." The article reported that Simkins said "he wouldn't accept the $15 tender for his 14 percent interest in Fibreboard. He declined to set a target figure that would be acceptable."

On that day, Simkins began to sell shares of Fibreboard when the price per share had risen to near $17. The sales were made through First Manhattan, a brokerage house, in ten or twenty thousand share lots with stop orders at set minimum prices. After each sale, Simkins and the broker conferred to decide if further sales could be made at approximately the same price. At the end of trading that day, Simkins had sold 67,200 shares at an average price of $16.376 per share.

On January 30, 1978, following the weekend, 207,700 shares of Fibreboard common stock were traded on the NYSE at prices ranging from $16.375 to $15.75, closing at $16 per share. Simkins sold 115,000 shares of Fibreboard through Bear, Stearns in transactions similar to those of the preceding trading day. The purchase price averaged $16.034 per share. On the following day, January 31, 463,700 shares of Fibreboard common stock were traded on the NYSE; prices ranged from $15.875 to $14.625, closing at $15 per share. Simkins sold a total of 295,000 shares through Bear, Stearns. The sales for that day averaged slightly over $15 per share.

Plaintiff Feldman purchased 500 shares of Fibreboard at $14.875 per share on January 31, 1978, after his broker had advised him of the pending L–P merger offer. At 6 p. m. that day, L–P issued a press release announcing the formal withdrawal of its offer to purchase Fibreboard stock at $15 per share. A Dow Jones tape release and articles in the *Wall Street Journal* and *San Francisco Examiner* publicized the withdrawal and quoted a L–P spokesman as stating that the offer was withdrawn when the three largest shareholders rejected the $15 price. (The January 24, 1978, letter specified that the offer would expire if the approval of the shareholders was not obtained by January 31, 1978). On February 1, 1978, Simkins mailed a Schedule 13D to the SEC, NYSE, ASE and Fibreboard, disclosing the sale of its 477,200 shares of Fibreboard common stock.

On February 2, plaintiff Feldman sold his 500 shares of Fibreboard common stock for an average price of $14.175. On that day also, Fibreboard issued a news release stating that discussions with a number of companies concerning possible acquisitions would continue. On March 10, 1978, L–P and Fibreboard announced agreement in principle on a merger at $17 per share; on March 23, the parties signed an agreement approving the merger at that price.

## DISCUSSION

Plaintiff has pursued various theories in the course of this litigation. At this stage only those based on § 10(b) and Rule 10b–5 [2]

---

**2.** Section 10(b) of the 1934 Act makes it unlawful for one "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j.

Acting pursuant to this grant of rule-making authority, the SEC promulgated Rule 10b–5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

survive; they may be summarized as follows:

A. Simkins, by reason of its ownership of the largest single block of Fibreboard stock, was an insider and as such under a duty to disclose material information or refrain from trading.

B. Simkins was under a duty to disclose or refrain from trading by reason of its possession of non-public material information;

C. Simkins manipulated the market by selling its Fibreboard holdings under cover of misleading public statements.

Each of these theories will be discussed briefly below. In addition, the Court will discuss the aiding and abetting claim against Bear, Stearns and plaintiff's damage evidence.

### A. Insider Liability

Since the leading decision in *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961), it has been settled that "a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella v. United States*, —— U.S. ——, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980). The Court will assume, for purposes of this disposition, that the jury could have found from the evidence that Simkins's sale of large blocks of Fibreboard stock was material information.[3] *See Nelson v. Serwold,*

576 F.2d 1332, 1335–36 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

 The Court is not aware of any authoritative and all-inclusive definition of the term "insider." *Chiarella v. United States, supra.* However, insider status results from being an officer, director or controlling shareholder or from standing in a special relationship affording access to inside information intended to be available only for a corporate purpose. *Chiarella v. United States, supra*, 100 S.Ct. at 1114; *Cady, Roberts, supra*, 40 S.E.C. at 912. Simkins falls into none of these categories. The most that could be said is that Leo Simkins controlled the largest single block of Fibreboard stock. He was not a controlling shareholder, however; he did not even have representation on the board of directors and it is not contended that he had access to any non-public corporate information. *See* 2 Loss, Securities regulation c.5B (2d ed. 1961). Accordingly, Simkins was not subject to an insider's duty to refrain from trading.[4] *McLean v. Alexander*, 449 F.Supp. 1251 [1978] Fed.Sec.L.Rptr. (CCH) ¶ 96,390 (D.Del.1978); *Harnett v. Ryan Homes, Inc.*, 360 F.Supp. 878, 886 (W.D.Pa. 1973), *aff'd*, 496 F.2d 832 (3d Cir. 1974).

### B. Duty to Disclose or Refrain

 Feldman contends, however, that Simkins was under a duty to refrain from trading in Fibreboard stock regardless of

---

under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5 (1975).

**3.** Plaintiff argued that had prospective investors known that Simkins was in the process of selling some 400,000 shares of Fibreboard, they might have been influenced by that knowledge in making decisions whether to buy and at what price. Some prospective purchasers, moreover, might have considered Simkins's sale of its holdings as having a bearing on the prospects of a merger. The Court will assume, without deciding, that a sufficient showing has been made to warrant a finding of materiality.

**4.** Insider liability would be precluded in this case for the further reason that it does not encompass a duty "to confer upon outside investors the benefit of [the insider's] superior financial or other expert analysis . . . ." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Har.L.Rev. 322, 362 (1979). *Compare, Lewelling v. First California Co.*, 546 F.2d 1277 (9th Cir. 1977) (imposing liability under Rule 10b–5 on a group of shareholders and a brokerage house for engaging in a scheme to dispose of insiders' holdings without revealing the source of the securities).

insider status if it possessed but failed to disclose non-public information which other buyers or sellers of the stock would consider material. Even assuming the materiality of information concerning Simkins's sales, the argument must be rejected in light of the Supreme Court's decision in *Chiarella v. United States, supra.* There the Court held that an employee of a financial printer owed no duty to disclose to the market, before purchasing shares of a target corporation, the identity of that corporation which he had deduced from incomplete announcements supplied to his employer, since he

> had no prior dealings with [the traders]. He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a complete stranger who dealt with the sellers only through impersonal market transactions.

100 S.Ct. at 1117. The Court held that "the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or similar relation of trust and confidence between them.'" 100 S.Ct. at 1114.[5] Inasmuch as Simkins stood in no fiduciary relation to market traders, the reasoning of the Court applies here. Likewise, in *General Time Corporation v. Talley Industries, Inc.,* 403 F.2d 159, 164 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed. 570 (1969), the court concluded that it knew of "no rule of law . . . that a purchaser of stock, who was not an 'insider' and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale." (Knowledge of possible merger whose terms might be more favorable than current offer). *Cf. Wright v. Heizer Corp.,* 560 F.2d 236, 248 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275 (2d Cir. 1975); *SEC v. Great American Industries, Inc.,* 407 F.2d 453, 460 (2d Cir. 1968), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); *Matarese v. Aero-Chatillon Corp.,* [1972–73] Fed.Sec. L.Rptr. (CCH) ¶ 93,322 at 91,733 (S.D.N.Y. 1971); *Pacific Insurance Company v. Blot,* 267 F.Supp. 956, 957 n.2 (S.D.N.Y.1967) (dictum). (Under § 14(d–f) of the Williams Act (15 U.S.C. § 78n(d–f), a potential acquirer need not disclose its intent to make a tender offer until it obtains more than 5 percent of the target company's stock). *See* Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws,* 93 Harv.L.Rev. 322, 362, 371–375 (1979).[6]

---

**5.** It is significant that plaintiff's claim would fail even under the reasoning of the three dissenting justices. *See* opinions of Chief Justice Burger (the rule against requiring disclosure in an arm's length business transaction should give way "when an informational advantage is obtained, not by superior experience, foresight, or industry, but by some unlawful means,"), 100 S.Ct. at 1120 and Justice Blackmun (". . . persons having access to confidential material information that is not legally available to others generally are prohibited . . . from . . . exploiting their structural informational advantage . . ."), 100 S.Ct. at 1126. Neither reason would apply to Simkins on the facts of this case.

**6.** Plaintiff is necessarily vague as to just what he would have required Simkins to disclose. There is no evidence that Simkins ever formed a plan or intent to sell its entire Fibreboard holdings at or about a specified time. Leon Simkins testified that he had considered disposing of the Fibreboard stock for some time but wanted to do so at a price that would enable him to recoup the original investment. When the price rose after the L–P offer he decided to "test the waters" to see how much of the stock could be sold without adversely affecting the price. He proceeded to sell in lots of a few thousand shares with a minimum price set for each order. Only on January 31, 1978, after having reduced his holdings considerably without significant impact on the market price, did he decide to dispose of the balance of his holdings.

On this record, there would have been no justification for a public announcement that Simkins intended to sell all of its Fibreboard stock. Moreover, had such an announcement been made, other shareholders desirous of selling might have been expected with some reason to charge that market manipulation had occurred. *See* discussion at pp. 846–847, *infra. See also* 6 Loss, Securities Regulation c.9C at 3562 (Supp.1969); Section 9 of the Exchange Act (15 U.S.C. § 78i); 3 Bromberg, Securities Laws § 8.4 (413) at 204.50 (1977)

## C. *Market Manipulation*

Finally plaintiff contends that Simkins's course of conduct amounted to market manipulation. He relies principally on *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979). In that case, plaintiffs alleged that a financial columnist of a newspaper had purchased shares of a small corporation at a discount before writing a highly favorable column about the corporation based on information supplied by its officers some of which was false. After the column appeared, the price of the stock rose sharply and defendant sold a portion of his shares at a substantial profit. In reversing a judgment dismissing the complaint, the court held, first, that under the circumstances of the case, information that the columnist had bought shares at a discount and that he had a practice of trading in stocks of corporations reviewed in his column was material. Second, the court ruled that the columnist had a duty to disclose that he expected to gain personally by trading in the stock if the readers of his column bought stock favorably reviewed, thereby raising the price. While the court acknowledged that ordinarily there would be no duty to disclose information about personal financial affairs, such a duty arose when the columnist's effort to profit from his column at the expense of his readers created a conflict of interest. That duty extended also to nonreaders victimized by the resulting manipulation of the market. 594 F.2d at 1268.

Assuming for purposes of this discussion the continuing validity of *Zweig* notwithstanding *Chiarella*, it is a case of active market manipulation and conflict of interest, not mere nondisclosure. As an informal financial adviser in a medium he knew influenced market investors, defendant misled his readers by falsely creating an aura of unbiased advice. The column's effect on market prices did not by itself violate the securities laws, but defendant's deliberate, undisclosed dealings in corporate securities upon which he reported raised a triable question of fact whether he intended to manipulate the market for his own personal benefit. 594 F.2d at 1269–71.

Plaintiff, here, relies on evidence, first, that Simkins told brokers and reporters who inquired that he considered the $15 per share offer insufficient, while simultaneously selling at that price, and, second, that he permitted the impression to develop that he was holding out for a higher bid, while secretly disposing of his stock. Such evidence is insufficient to support a finding of market manipulation, let alone fraud or misrepresentation. Simkins took no action to influence or affect the market. His responses to inquiries were truthful; when they were made, he was selling Fibreboard stock at prices well above $15. He never suggested that he would hold out for a higher merger offer and would not sell his shares in the meantime. It is true that he did not affirmatively disclose that he was selling Fibreboard shares—at first, in small lots and eventually, the balance of his holdings. To have done so would have undoubtedly depressed the market, but the failure to make public announcements of such activity under the circumstances of this case cannot be considered manipulation. *See* note 6 *supra.* To support a finding of market manipulation, more is required than taking advantage of favorable market prices. *Cf. Shores v. Sklar*, 610 F.2d 235 (5th Cir. 1980) (fraudulent offering circular issued); *Lewelling v. First California Co.*, *supra*, (scheme to "launder" the securities in order to conceal the underlying "bail-outs" by insiders); *United States v. Charnay*, 537 F.2d 341 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976) (market price artificially depressed by short sale of large blocks of stock and secret side profits); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (advantageous merger ratio gained by misleading proxies and manipulated stock prices); *Crane Company v. Westinghouse Air Brake Company*, 419 F.2d 787 (2d Cir. 1969), *cert. denied*, 400 U.S. 822,

(persons selling large blocks of stock will act to avoid driving the price down; conduct contrary to this logic is evidence of manipulative purpose under § 9).

91 S.Ct. 41, 27 L.Ed.2d 50 (1970) (demand artificially increased by excessive purchases and off the market sales); *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir. 1967) (manipulated market price by withholding dividends). Brudney, *supra*, 370–71.

### D. Aiding and Abetting

 Bear, Stearns could be held liable for aiding and abetting Simkins's alleged violations of the securities laws only upon proof that (1) Simkins violated Rule 10b–5; (2) Bear, Stearns had knowledge of Simkins's fraud; and (3) Bear, Stearns substantially assisted the violation. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47–48 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069 (N.D.Cal.1979). Even if Simkins's actions had amounted to fraud under Rule 10b–5, which they did not, there is no evidence suggesting that Bear, Stearns had knowledge of anything more than Simkins's dissatisfaction with its Fibreboard holdings and its interest in selling at a price which would enable it to recoup its investment. Even if a jury could infer knowledge of fraud based on such evidence, Bear, Stearns did not substantially assist Simkins's disposition of Fibreboard stock. *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 163 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). There is no indication that Bear, Stearns acted as anything other than a broker, performing ministerial tasks which could have been done by any other brokerage house. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152, 92 S.Ct. 1456 (1972); *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 888 (3d Cir. 1975); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94–95 (5th Cir. 1975); *Mendelsohn v. Capital Underwriters, Inc.*, *supra*, at 1083; *H. L. Federman & Co. v. Greenberg*, 405 F.Supp. 1332, 1338 (S.D.N.Y.1975). In the absence of an affirmative duty to disclose, there can be no liability for mere inaction or silence. *Strong v. France*, 474 F.2d 747, 752 (9th Cir. 1973). On the present facts, no such duty

ran from Bear, Stearns to anonymous market traders. *See Mendelsohn v. Capital Underwriters, Inc.*, *supra*, at 1083.

### E. Damages

 Plaintiff has the burden of proving every element of his case, including damages. The law does not require mathematical precision in measuring damages, but sufficient facts must be introduced to support an intelligent estimate without speculation or conjecture. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 891, 894–95 (3d Cir. 1975), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976). Although a defendant whose wrongful conduct makes precise proof of damages impossible must bear the risk of uncertainty created by his conduct, *Elkind v. Liggett & Myers, Inc.*, 472 F.Supp. 123, 132 (S.D.N.Y.1978), plaintiff must nonetheless show that he has in fact been injured. *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455–56 (2d Cir. 1977); *Gould v. American-Hawaiian S.S. Co.*, *supra*, 535 F.2d at 782.

Plaintiff's expert witness testified on direct examination that the price per share of Fibreboard stock would have been $13.89 if nothing unusual had happened during the period from January 26 to January 31, 1978. He conceded that he could not isolate the effect of Simkins's actions from that of the merger offer or of speculation and reports in the financial press. His testimony concerning a hypothetical market price is not only purely speculative but could not sustain a damage verdict for any class member, lacking as it did a predicate of causation.

 On cross examination, the witness testified differently, stating that the price would have fluctuated near $15 per share absent statements allegedly leading investors to believe that there would be further negotiations for a higher price. He also commented that Simkins's sales of nearly half of the one million shares traded during

the period had no effect on the market price. Even if this testimony were accepted as a basis for a verdict (notwithstanding the fact that it flies in the face of the law of supply and demand), it would preclude a damage award to plaintiff, who purchased Fibreboard stock at 14⅞, and therefore failed to prove injury to himself. Accordingly, even had liability been established, plaintiff's damage proof is insufficient as a matter of law.

## CONCLUSION

For the reasons stated, defendants are entitled to judgment as a matter of law; their motion for a directed verdict must be granted.

IT IS SO ORDERED.