Roberto RODRIGUEZ, Ricardo Rodriguez and Ventura Rodriguez & Sons, Inc., Plaintiffs,

v.

Mario MONTALVO, Tania R. De Montalvo, and the conjugal partnership created by them, and Cadierno Corporation, Defendants,

Waldemar V. Rodriguez-Cabra, Third-Party Defendant.

Waldemar
RODRIGUEZ–SANTIAGO, Plaintiff,

v.

Mario MONTALVO, Tania R. De Montalvo, their conjugal partnership, and Cadierno Corporation, Defendants.

Civ. Nos. 84–0862(RLA), 84–3075(RLA).

United States District Court,
D. Puerto Rico.

Dec. 3, 1986.

Federico Ramírez Ross, Ramirez, Latimer & Biaggi, San Juan, P.R., for plaintiffs.

A.J. Amadeo Murga, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

ACOSTA, District Judge.

These two consolidated actions were instituted by Ventura Rodríguez & Sons, Inc. and three Rodríguez-Santiago brothers, former shareholders of Cadierno Corporation (Cadierno), attacking the validity of the transfer of their shares to Cadierno. Plaintiffs claim the aforementioned sale was effected in contravention of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b), and Rule 10b–5 issued thereunder, 17 C.F.R. sec. 240.10b–5, as well as certain local statutes.

Defendants have moved the Court to enter summary judgment dismissing the complaint filed in Civil Action No. 84–3075 by Waldemar Rodriguez-Santiago. The pertinent issues having been duly briefed by the parties to this action, the Court hereby rules as follows.

## THE FACTS

1. Cadierno was purchased by Waldemar Rodríguez-Santiago (plaintiff) and his brothers in 1978.[1]

2. Pursuant to a Service Agreement dated August 24, 1978, Mario Montalvo (Montalvo) was designated president and chief executive officer of Cadierno and was issued thirty-five percent (35%) of the total shares of the corporation.[2]

3. Waldemar Rodríguez-Santiago was appointed Chairman of the Board of Directors of Cadierno.[3]

4. Don Ventura Rodríguez, the grandfather of the Rodríguez-Santiago brothers, provided financial assistance to Cadierno by personally guaranteeing loans made by the Royal Bank of Canada.[4]

5. Don Ventura Rodríguez passed away on July 20, 1980.[5]

6. On August 17, 1981, Cadierno entered into a non-exclusive wholesaler agreement with Searle Caribbean, Inc. for the distribution of Searle's consumer products, including "Equal".[6]

7. In a letter dated August 24, 1981, Waldemar Rodríguez-Santiago explained to Montalvo his concern with the exposure of the estate of Ventura Rodríguez based on the outstanding One-Million-Dollar ($1,000,-000.00) guaranty for Cadierno's debts and requested his assistance in selling their stock in the company under the following terms:

a. Transfer of sixty-five percent (65%) of shares in exchange for release of the guaranty in full.

b. The shareholders would pay an outstanding Forty-Two Thousand Dollars ($42,000.00) to Segundo Rodríguez and Hulvia Rodríguez.

c. Release of future claims.

d. Assignment of a computer lease agreement.

Waldemar Rodríguez-Santiago further stated the shareholders were willing to cancel any outstanding obligation Montalvo had with them or the estate.

In addition, Ventura Rodríguez & Sons, Inc. was willing to transfer the distribution rights for "Dry Sack & Pernord" lines so Cadierno could become its exclusive distributor in Puerto Rico.[7]

8. A document incorporating essentially the same terms and dated September 28, 1981 was subscribed by Ventura Rodríguez & Sons, Inc. and Roberto (through his father), Ricardo and Waldemar Rodríguez-Santiago before a notary public. The offer was valid up to March 1, 1982.[8]

9. By letter dated December 1, 1981, Luis B. González, certified public accountant for Cadierno, advised Montalvo of Cadierno's financial projection for the year 1982 and, in pertinent part, stated: [9]

> Recently the corporation received from Bacardi an offer of four hundred thousand dollars ($400,000) for the exclusive rights of Cadierno Corp. in the well-known line: Dry Sack. Initial considerations tended to reject the offer in view of the effects the handing out of such an important line might have in the company's distribution capacity as well as on the morale of its sale force. Nevertheless, these initial considerations disappear when the corporation is selected by Searle Laboratories to distribute in supermarkets and other commercial estab-

---

1. Affidavit of Waldemar Rodríguez-Santiago, plaintiff's Exhibit A, para. 8.

2. Defendants' Exhibit 1.

3. Affidavit of Waldemar Rodríguez-Santiago, plaintiff's Exhibit A, para. 14.

4. Complaint, para. 7, admitted by defendants in their answer.

5. Modified Agreement dated May 4, 1982, p. 2, defendants' Exhibit 2B.

6. Defendants' Exhibit 3.

7. Exhibit to deposition of Waldemar Rodríguez-Santiago, defendants' Exhibit 2.

8. Exhibit to deposition of Waldemar Rodríguez-Santiago, defendants' Exhibit 2.

9. Plaintiff's Exhibit 5.

lishments, with the exception of drugstores, their new product EQUAL, a substitute for sugar *which Searle estimates a potential of five hundred thousand dollars ($500,000) in sales, outside the drugstores' area, during the first year.* The conditions offered by the manufacturer seem extremely attractive: ...

(Emphasis ours.)

10. In a letter addressed to Waldemar Rodríguez-Santiago dated January 25, 1982, Montalvo indicated he was enclosing the financial statements for Cadierno up to June 30, 1981. He noted that these reflected an extraordinary loss due to stolen merchandise, as well as to increases in interest rates for outstanding loans and for uncollectible accounts.

According to the letter Montalvo responded to these problems by taking measures to avoid future thefts, reducing personnel, negotiating with the Royal Bank of Canada to lower the interest rates through the use of 936 funds, and reorganizing the collections department.

Montalvo also included the financial statements for Cadierno up to December 30, 1981. According to Montalvo, these indicated a net accrued corporate benefit of Forty-Six Thousand Six Hundred Fifty-Nine Dollars and Seventy-Three Cents ($46,659.73) which he felt compared very favorably to the accrued earning of Six Thousand Four Hundred Ninety-Five Dollars and Thirty-Three Cents ($6,495.33) for December 31, 1980. He attributed the higher amount to savings from the cuts in personnel.[10]

11. On March 30, 1982, Montalvo submitted to the Royal Bank of Canada a formal request for a modification of the loan contract.

In support of the viability of his proposal, Montalvo submitted the five-year projection prepared by the certified public accountant and also made reference to the 1982 operational plan submitted to the Royal Bank of Canada in December 1981.[11]

12. An extraordinary meeting of the Board of Directors of Cadierno was held on April 28, 1982. Waldemar Rodríguez-Santiago and Mr. and Mrs. Mario J. Montalvo were present.

According to the minutes, Mr. Rodríguez explained that the estate of Ventura Rodríguez wanted to limit the One-Million-Dollar ($1,000,000.00) guaranty.

Montalvo stated he had been in contact with the estate and the Royal Bank of Canada. Montalvo had also spoken with Bacardi Corporation and Julius Wile and Sons, Inc. to sell the Dry Sack line for Four Hundred Thousand Dollars ($400,000.00) in order to raise sufficient funds to first reduce the guaranty and then extinguish it within a reasonable period of time. The distribution of the remaining Julius Wile and Fleishman distilling products would be handed over to Julius Wile and Sons, Inc. by December 30, 1982.

Montalvo also stated that the Royal Bank would lower the One-Million-Dollar ($1,000,000.00) guaranty to Four Hundred Thousand Dollars ($400,000.00) in exchange for a partial loan payment of Four Hundred Thousand Dollars ($400,000.00), as well as additional guarantees by Montalvo, and repayment of the balance within five (5) years. A resolution along these lines was approved by Waldemar Rodríguez-Santiago and Mr. and Mrs. Montalvo.[12]

13. On or about May 4, 1982, the estate of Don Ventura Rodríguez was liable to the Royal Bank of Canada for loans to Cadierno in the amount of One Million Dollars ($1,000,000.00).[13]

14. Pursuant to the terms of the modified agreement dated May 4, 1982,[14] the

10. Plaintiff's Exhibit F.

11. Plaintiff's Exhibit G.

12. Exhibit to deposition of Waldemar Rodríguez-Santiago, defendants' Exhibit 2.

13. Para. 8 of the complaint, admitted by defendants in their answer.

14. Defendants' Exhibit 2B.

Royal Bank reduced the estate guaranty to Four Hundred Thousand Dollars ($400,000.00) subject to, *inter alia*, reduction of the Cadierno debt to Nine Hundred Thousand Dollars ($900,000.00) and the following additional collateral securities from Cadierno and Montalvo:

    a. Assignment of Montalvo's insurance policy for Five Hundred Thousand Dollars ($500,000.00);

    b. Second mortages on Montalvo's properties up to One Hundred Thousand Dollars ($100,000.00);

    c. Mr. and Mrs. Montalvo's personal guarantee for Nine Hundred Thousand Dollars ($900,000.00).

In addition, Cadierno was to receive all certificates of stock belonging to the Rodríguez-Santiago brothers and the estate.

Cadierno was to pay weekly installments of One Thousand Dollars ($1,000.00) for five (5) years commencing June 7, 1982 and the guaranty of the estate was to be reduced accordingly.

15. Advertising for "Equal" appeared in various local publications throughout 1982 identifying Cadierno as its distributor to supermarkets.[15]

16. Montalvo was given the Top Management Award by the Sales and Marketing Executive Association for an outstanding performance in the food distribution field for 1982.[16]

17. An article was published in the newspaper *El Mundo* on March 26, 1983 entitled "Equal and Other Successes of Cadierno, in Only Three Years!", which discussed the successful distribution of said product in Puerto Rico and Montalvo's Top Management Award.[17]

---

15. Defendants' Exhibit 4 (a to m), *The San Juan Star*, March 31, 1982, Mundo Alimenticio (undated), Vea April 4–10 and 18–24, 1982; May 2–8 and 16–22, 1982; May 30—June 5, 1982; June 6–12, 1982; September 19–25, 1982.

16. Defendants' Exhibit 10.

17. *Id.*

18. Defendants' Exhibit 9.

18. By letter dated February 24, 1983, Waldemar Rodríguez-Santiago congratulated Montalvo on having received the Top Management Award.[18]

19. The financial statements for Cadierno prepared by its certified public accountant and available in the record indicate Cadierno's financial condition as follows:

Six months ended June 30,
    1979 . . . . . . . . . . . . . . . . . . deficit $1,052,378 [19]
  Year ended June 30, 1980 . . deficit $1,409,618 [20]
  Year ended June 30, 1981 . . deficit $1,369,723 [21]

## ARGUMENTS

In essence, Waldemar Rodríguez-Santiago avers that Montalvo breached his fiduciary duty by failing to fully disclose the financial condition of Cadierno and by misrepresenting its economic potential prior to the transfer of shares. According to Rodríguez-Santiago, Montalvo's specific misrepresentations were that: [22]

    a) Cadierno had been appointed the distributor of Puerto Rico of new lines of products, such as the product "Equal".

    b) A substantial increase in sales volume and net income was anticipated for Cadierno in the immediate future.

Defendants, on the other hand, contend that plaintiff does not have a valid claim under Rule 10b–5 because Waldemar Rodríguez-Santiago was an insider, no material omissions or misrepresentations were made, nor was there any reliance, and, finally, that plaintiff failed to exercise due care in the sale of his shares.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78j(b) in pertinent part reads:

    It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality . . .

---

19. Plaintiff's Exhibit B.

20. Plaintiff's Exhibit C.

21. Plaintiff's Exhibit D.

22. Complaint, para. 15.

(b) To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Pursuant to its vested powers, the Commission adopted Rule 10b–5, 17 C.F.R. sec. 240.10b–5, which provides:

It shall be unlawful for any person, directly or indirectly, . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The Court of Appeals for the First Circuit has identified the requirements of a Rule 10b–5 action as: scienter; material omissions and/or misrepresentations; reliance; and plaintiff's due care. *Holmes v. Bateson*, 583 F.2d 542 (1st Cir.1978).

### INSIDER

■ Defendants' first argument is to the effect that Montalvo owed no duty of disclosure to Waldemar Rodríguez-Santiago because he was also an "insider" and as such had equal access to the allegedly undisclosed material information. Nonetheless, any corporate insider is bound to either disclose all material information known to him or abstain from trading. Failure to abide by this standard will subject him to section 10(b) liability.

The following facts were identified by the Securities Exchange Commission as pertinent to the issue of who is to be regarded as an insider and thus have the consonant duty to disclose or abstain from trading:

/F/irst, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing.

*In Re Cady, Roberts & Co.,* 40 S.E.C. 907, 912 (1961) (footnote omitted), cited with approval in *Dirks v. S.E.C.,* 463 U.S. 646, 653, 103 S.Ct. 3255, 3260, 77 L.Ed.2d 911 (1983); *Chiarella v. United States,* 445 U.S. 222, 226–27, 100 S.Ct. 1108, 1113–14, 63 L.Ed.2d 348 (1980).

In *Chiarella, supra,* the Supreme Court held that liability for non-disclosure requires both an insider status based on the access to confidential information and the existence of a fiduciary relationship of "trust and confidence" between the parties. *Id.* at 228. *See also Dirks, supra.*

Montalvo was the president and chief executive of Cadierno and owner of thirty-five percent (35%) of its shares since 1978. Furthermore, Montalvo has not controverted the allegations of trust and confidence made by Waldemar Rodríguez-Santiago.

■ Based on the foregoing, for purposes of this Opinion and Order, we find he owed a fiduciary duty to Waldemar Rodríguez-Santiago. Furthermore, at no time does Montalvo deny having access and knowing the alleged undisclosed information. His only argument is to the effect that Waldemar Rodríguez-Santiago had equal access to it.

It is "axiomatic that one insider cannot maintain a suit against another." *Harnett v. Ryan Homes, Inc.,* 360 F.Supp. 878, 885 (W.D.Pa.1973), *aff'd,* 496 F.2d 832 (3rd Cir. 1974); *see also Rosenbloom v. Adams, Scott & Conway, Inc.,* 552 F.2d 1336, 1338 (9th Cir.1977).

■ The duty to disclose presupposes the lack of complete information between two persons and seeks to provide a remedy

to those who enter into transactions without the benefit of all the relevant information available to the other party.

Obviously if both parties to the sale are equally well informed then both are "insiders" and neither can be said to have defrauded the other. The question of who is an "insider", therefore, cannot be decided on the basis of the title one holds in the corporate organization. A director, or officer, or even the president of a corporation cannot always and invariably be classified as an insider. The analysis turns, instead, on the basis of what a party knows or reasonably should know considering the information to which he has access.

*Harnett, supra,* 360 F.Supp. at 886.

Even though plaintiff's position within the corporate structure is relevant, it must be examined in conjunction with his real access to information, the degree of knowledge involvement and control of the operations, and plaintiff's professional experience or expertise. *See Rosenbloom, supra,* 552 F.2d at 1339; *Kohler v. Kohler Co.,* 319 F.2d 634, 642 (7th Cir.1963); *Feldman v. Simkins Industries, Inc.,* 492 F.Supp. 839, 844 (N.D.Cal.1980), *aff'd,* 679 F.2d 1299 (4th Cir.1982); *Harnett, supra,* 360 F.Supp. at 886.

We must look at the submitted facts in this case and examine whether in fact plaintiff's role within Cadierno relieves defendant of liability.

In their motion for summary judgment, defendants allege that, Waldemar Rodríguez-Santiago, as chairman of the Board, had the same access as Montalvo to the financial status of the corporation. They further contend that the extensive advertising of the new product lines made their distribution by Cadierno common knowledge. Lastly, defendants argue that Waldemar Rodríguez-Santiago utilized Cadierno's same accountant and bank for his other business interests, yet he never attempted to get any pertinent information from them.

Montalvo argues that Waldemar Rodríguez-Santiago was pressing for a rush sale to avoid possible additional future losses.

In his affidavit, Waldemar Rodríguez-Santiago states that even though he was chairman of the Board of Directors of Cadierno, he "did not intervene in the day to day management of the company and depended entirely in Montalvo for information ... /and/ had no direct access to Cadierno's books and records." [23]

■ According to the above case law, plaintiff's title within Cadierno is not conclusive as to his insider/outsider status. The final determination will depend on the extent to which he had real access to the particular information at issue, and on his involvement with the daily operations of the corporation.

We find the pertinent facts on this particular matter are in controversy; and, hence, we cannot find at this time that Waldemar Rodríguez-Santiago was an "insider" of Cadierno.

### RELIANCE

Defendants have attempted to rebut plaintiff's allegations of reliance by pointing to the fact that, upon learning of "Equal's" economic success, Waldemar Rodríguez-Santiago congratulated Montalvo when he received the Top Management Award and failed to take any action with respect to the sale of shares. Waldemar Rodríguez-Santiago explains that, when he learned about "Equal's" success, he was not aware that its distribution contract antedated the sale of his stock.[24]

■ In non-disclosure cases, reliance need not be established independently, but may be presumed once materiality is established.

Under the circumstances of this case, involving primarily a failure to disclose,

---

23. Plaintiff's Exhibit A, para. 14.

24. Affidavit of Waldemar Rodríguez-Santiago, plaintiff's Exhibit A, paras. 39–40.

positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Affiliated UTE Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (citations omitted).

Inasmuch as plaintiff charges defendants with both material omissions and misrepresentations in that they allegedly disclosed only partial information and gave an unrealistically bleak future for Cadierno, we shall not discuss reliance separately and instead will touch upon the "materiality" of those omissions.

### MATERIALITY

■ In examining whether a particular fact is material, the courts will determine whether a reasonable shareholder would have considered the information significant under the particular circumstances in making an investment decision. *See S.E.C. v. MacDonald*, 699 F.2d 47, 49 (1st Cir.1983); *Holmes, supra*, 583 F.2d at 557.

A fact, then is "material" if there is a substantial likelihood that a reasonable person would consider it important in making an investment decision. The test is an objective one. Moreover, unlike the reliance concept, it does not require a showing that someone was *in fact* influenced by a particular misrepresentation or omission. Rather, a misrepresentation or omission is "material" if it would in all likelihood influence the investment judgment of a reasonable person.

William H. Painter, *The Federal Securities Code and Corporate Disclosure* sec. 5.05 at 169 (The Michie Company 1979) (footnotes omitted).

Defendants argue that the failure to disclose the addition of "Equal" to Cadierno's product lines and its true projected economic impact was not material since it substituted "Dry Sack", its most important line, and its success at that time "laid only on projections, hopes and the tenacity of Mario Montalvo".[25] We disagree.

The record indicates that the financial projection for 1982 was prepared by a certified public accountant and submitted to the Royal Bank in support of a request for a modification of Cadierno's credit terms. Any reasonable person would consider the projected impact of the distribution of "Equal" an important factor in making an investment decision such as the sale of stock when estimated sales were Five Hundred Thousand Dollars ($500,000.00). "Obviously, if defendant himself considered the information important in deciding whether to purchase, he knew a reasonable investor would likewise consider it important in deciding whether to sell." *S.E.C., supra*, 699 F.2d at 51. Accordingly, we find the information pertaining to "Equal" to be material.

### DUE CARE

Relying on *Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5th Cir.1970), *cert. denied*, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), defendants argue the complaint should be dismissed because Waldemar Rodríguez-Santiago failed to exercise due care in the sale of his shares. According to defendants, because Waldemar Rodríguez-Santiago wanted a rush sale, he failed to investigate the economic status of Cadierno previous to the transfer, and, if true, such lack of diligence bars recovery.

There is disagreement with respect to whether due care should be an element of a cause of action or a defense, the proper standard of care, and whether it is plaintiffs or defendants who carry the burden of proof. 3 Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud* secs. 8.4(652) to 8.4(658) at 204.248 to 204.265 (1985); Painter, *supra*, sec. 7.02 at 304–06; Robert H. Wheeler, "Plaintiff's Duty of Care Under Rule 10b–5: An Implied De-

---

**25.** Brief in support of motion for summary judgment, p. 11.

fense to an Implied Remedy", 70 *NW. U.L. Rev.* 561, 601 (Sept.-Oct. 1975). Even its applicability has been questioned. Margaret V. Sachs, "The Relevance of Tort Law Doctrines to Rule 10b-5: Should Careless Plaintiffs be Denied Recovery?", 71 *Cornell L. Rev.* 96, 142 (Nov. 1985).

■ We find that under *Holmes, supra,* 583 F.2d at 551, due diligence is a separate element required to establish a cause of action under Rule 10b-5 and, hence, it is plaintiff's burden to prove it. There is, however, a problem in deciding what particular type of conduct on the part of plaintiff will bar recovery. In other words, what is the standard of care required of plaintiff for him to prevail? In *Holmes, supra,* 583 F.2d at 559 n. 21, the Court seemed to agree with the *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977), reasoning that mere negligence on the part of plaintiff should not be an available defense.

■ In ascertaining the type of conduct that will preclude recovery under the due care principles, we find that only when plaintiff's conduct reaches a level of recklessness will the due diligence defense apply. In other words, mere negligence on plaintiff's part will not act as a bar to a Rule 10b-5 suit. *Xaphes v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 600 F.Supp. 692, 694 (D.Me.1985); *see also Xaphes v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 632 F.Supp. 471 (D.Me. 1986).

In defining the "reckless" standard, *Dupuy, supra,* 551 F.2d at 1020, stated:

/T/he question should not be whether /plaintiff/ acted unreasonably by failing to investigate the condition of /the corporation/. Instead, the Court should ask whether /plaintiff/ intentionally refused to investigate "in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so

great as to make it highly probable that harm would follow".

*Id., citing* W. Prosser, sec. 34 at 185 (1971).

■ Whether or not Waldemar Rodríguez-Santiago acted recklessly in failing to investigate further the financial situation of Cadierno, the existence of new profitable lines, and the existence of economic projections prepared shortly before the sale, is a matter for the jury to decide.

According to his affidavit, Waldemar Rodríguez-Santiago relied entirely on Montalvo, who was in control of the day-to-day operations of Cadierno and its financial resources.[26]

On January 25, 1982, Waldemar Rodríguez-Santiago was furnished with the audited financial statements of Cadierno for the period ending June 30, 1981 and unaudited up to December 30, 1981.[27] As he explains at paragraphs 27 through 30 of his affidavit,[28] plaintiff was concerned with consistent losses, as well as with previous discrepancies between unaudited and audited results. He also asked Montalvo about future profit expectations, and Montalvo allegedly responded that, even though it would be a better year, losses approximating One Hundred Thousand Dollars ($100,-000.00) were expected. Too many disputed facts come into play for the court to decide this issue summarily.

Given the aforementioned circumstances, we cannot find plaintiff acted recklessly by intentionally refusing to investigate more than he did or that he disregarded an obvious risk.

## STATUTE OF LIMITATIONS

### Applicable Statute

Defendants have moved the court to dismiss the complaint as time-barred.

■ Since there is no statutory time limitation for implied private actions brought under section 10(b) and Rule 10b-5, courts usually apply the most closely

**26.** Plaintiff's Exhibit A, para. 13.

**27.** Plaintiff's Exhibit F.

**28.** Plaintiff's Exhibit A.

analogous state rule. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976); *General Builders Supply Co. v. River Hill Coal Venture,* 796 F.2d 8, 11 n. 3 (1st Cir.1986); *Diamond v. Lamotte,* 709 F.2d 1419, 1421 (11th Cir.1983); *White v. Sanders,* 650 F.2d 627, 629 (5th Cir.1981).

In searching for the appropriate local statute, courts have looked at the cause of action that is most closely analogous to the Rule 10b–5 suit and at the same time best furthers the federal policies underlying the securities laws. The results, however, have been far from consistent. "Even courts that use the same or similar language in formulating these guidelines, however, differ both in their interpretations of federal policy and in their assessments of what features of a particular claim are most important for purposes of comparison to state-law remedies." Report of the Task Force on Statute of Limitations for Implied Actions, Committee on Federal Regulation of Securities, 41 *Bus. Law.* 645, 648 (Feb. 1986) (footnote omitted).

Traditionally, the courts have utilized either the period applicable to common law fraud suits or the local securities or blue sky laws. In *Verrecchia v. Paine, Webber, Jackson & Curtis,* 563 F.Supp. 360 (D.P.R. 1982), and *Salgado v. Piedmont Capital Corp.,* 534 F.Supp. 938 (D.P.R.1981), the court found the two-year statute of limitations provided in the Puerto Rico Securities Act, 10 L.P.R.A. sec. 890(e), applicable to section 10(b) and Rule 10b–5 suits.

■ After a thorough analysis explaining its preference for sec. 890(e) over the one year provided for actions sounding in tort, 31 L.P.R.A. sec. 5298, or for the fifteen years for actions for breach of contract, 31 L.P.R.A. sec. 5294, the court in *Verrecchia, supra,* concluded by saying: "All considered, the private cause of action expressly provided under the Puerto Rico Securities Act supplies the closest resemblance to the federal securities fraud in issue. Likewise, the two-year period of limitation regulating the filing of claims thereunder best effectuates the policy of federal law." *Id.* at 368. We agree with this logic.

The fact that a particular relief available under the federal statute is not allowed under the state provisions is not conclusive. The local and federal claims need not be identical. The main criteria should be that both are primarily concerned with the protection of investors from fraudulent transactions in the securities market. *Gurley v. Documation, Inc.,* 674 F.2d 253, 259 (4th Cir.1982). The fact that the local securities statute allows only for suits brought by "purchasers" and not "sellers" does not make the blue sky law period of limitations inapposite. *Id.* at 253; *White, supra,* 650 F.2d at 629. "We find the fact that both § 10(b) and the blue sky law address the problem of misinformation in securities transactions is far more significant, for present purposes, than the fact that the blue sky law does not specifically speak to frauds against sellers." *Gurley, supra,* 674 F.2d at 259.

### Accrual

Even though the state limitations period is applied, the date when it begins to run is determined by federal standards.

The courts will apply an objective test to determine whether a reasonable investor with plaintiff's knowledge would have become aware of the possibility of fraud. "/T/he statute of limitations applicable to claims under section 10(b) and Rule 10b–5 begins to run when an investor, in the exercise of reasonable diligence, discovered or should have discovered the alleged fraud." *General Builders Supply Co., supra,* 796 F.2d at 11; *see also Cook v. Avien, Inc.,* 573 F.2d 685, 695 (1st Cir. 1978).

■ Whether or not plaintiff exercised reasonable diligence to become aware of the fraud will depend on the particular facts of each case taking into consideration such factors as the fiduciary relationship between the parties, the particular type of fraud at issue, the opportunity to become aware of the fraud and defendant's subse-

quent conduct. *General Builders Supply Co.,, supra,* 796 F.2d at 12. Contrary to *General Builders Supply Co., supra,* the relevant facts in this action pertaining to the particular time when plaintiff Waldemar Rodríguez-Santiago was given adequate "inquiry notice", that is, put in a position to discover the fraud, are still in controversy.

## CONCLUSION

Summary judgment is proper only in those cases where, based on uncontested material facts, the moving party is entitled to relief as a matter of law. *Palhava De Varella-Cid v. Boston Five Cents Sav.,* 787 F.2d 676, 678 (1st Cir.1986).

Liability in this particular case, as well as the issue of timeliness of the suit hinge to a great extent on subjective evidence and on the totality of circumstances as they existed, which make summary judgment inadvisable, if not improper, in this case. "The delicate field of fiduciary relationships where the import of non-action must be assessed in the light of surrounding circumstances may well indicate a preference for the antennae of the fact finder over the cruder instrument of summary judgment." *Rogen v. Ilikon Corp.,* 361 F.2d 260, 265–66 (1st Cir.1966).

Based on the foregoing, the motion for summary judgment filed in Civil No. 84–3075 against Waldemar Rodríguez-Santiago on June 10, 1985 (Docket No. 16) is hereby denied.

IT IS SO ORDERED.